## DURANT *v.* THE SUPERVISORS OF THE COUNTY OF ALBANY.

A *bill in Chancery* in the nature of a *creditor's bill,* does not lie at the suit of a county, to enforce the payment of *county taxes,* where the *warrant for collection* has been returned *unsatisfied* to the county treasurer, for the want of property whereon to levy.*

APPEAL from Chancery. Durant, a resident of the city of Albany, was in 1833, taxed $197.50 as his proportion of the *county charges,* his personal property being assessed at $25,000; and in 1834, he was taxed $215

---

* The CHANCELLOR sustained the bill, holding it to be analogous to a creditor's bill, filed after the return of an execution at law unsatisfied, and he accordingly on appeal affirmed a decree overruling a demurrer which had been interposed. The defendant appealed to this court, where the decree of the Chancellor was *reversed.*

In this court, Mr. *Justice* COWEN delivered an opinion for affirmance, holding the case to be within *the equity of the statute,* allowing creditor's bills.

*Senator* HUMPHREY was also for affirmance: he holding that equity had jurisdiction of this case independent of the statute in respect to creditors' bills; but if not, that the case was clearly within the equity of the statute.

*Senator* VERPLANCK was also of opinion that the decree should be affirmed; he disclaiming to rely upon the equity of the statute, held that the court of chancery in the execution of its conceded jurisdiction, independent of the statute allowing *creditors' bills,* might grant its ancillary aid to enforce the payment of a judgment at law, in conformity to the doctrine held in *Hadden* v. *Spader,* 20 *Johns. R.* 554, and that the enforcement of the payment of a *public tax* was within the reason of the rule. He also was inclined to think that the neglect of an individual of sufficient ability to pay his share of the public taxes, was in the nature of a *fraud* and that on that ground alone, equity might interfere.

*Senator* ROOT delivered an opinion for a reversal of the decree. He insisted that the act allowing *creditors' bills* was a change of the common law; that it was limited in its terms to *judgment creditors,* and should not be extended by construction; and that if the law for the assessment and collec-

upon a like assessment.  Warrants for the collection of the taxes thus imposed, were duly issued and delivered to collectors who demanded payment of Durant, which he refused.  Durant having no goods or chattels in the county upon which a levy could be made to enforce payment, the warrants were returned *unsatisfied* to the county treasurer.  The supervisors of the county thereupon filed a bill in chancery, stating the above facts and alleging that Durant was the owner of property liable to taxation to the amount at which the same had been assessed, and had not appeared before the boards of assessors and made oath or offered to make oath to reduce the valuation of his estate; that he was the owner of personal property to a large amount, which could not be reached by a warrant authorized by law to be issued for the collection of taxes, and (for the purpose of giving jurisdiction) that he had *equitable effects* to the value of more than $100.  The bill prayed for a discovery of choses in action, credits, &c. and for the appointment of a receiver.  The defendant interposed a *demurrer*, which was overruled by the VICE-CHANCELLOR of the third circuit: which decision on appeal was sustained by the CHANCELLOR, who delivered the following opinion:

" The case made by the complainants' bill presents the question, whether a wealthy individual taxed on account

1841.

Durant
*v.*
The Supervisors of Albany county.

---

tion of taxes was defective, an appeal should be made to the legislature, and not to the court of chancery, to remedy the defect.

The PRESIDENT of the Senate was also of opinion, that the decree of the Chancellor should be reversed.  He held that previous to the Revised Statutes going into operation, whereby creditors' bills are authorized to be filed, the court of chancery had not the power to grant its aid in the collection of a common law judgment, except in cases of *fraud, trust,* or to remove impediments from the title.  He denied the authority of the doctrine in *Hadden* v. *Spader,* 20 *Johns. R.* 554, and insisted that the law previous to the statute, was as it had been expounded by *Chancellor* SANFORD, in *Donnovan* v. *Finn,* 1 *Hopkins R.* 59.  He objected to the application of the principle, that a case may be within the equity, though not within the words of a statute, when the statute changes the common law, and is in its terms limited to a specific case.

of his personal estate, can escape from his liability for the payment of the tax, if he thinks proper to invest his funds in bonds and mortgages, or other property, which cannot be distrained and sold under the supervisors's warrant to the collector. It is a general principle of the common law that every person is bound and hath virtually agreed to pay such particular sums as are charged upon him by law on the sentence, or direction of a competent tribunal, having legal authority to impose such charge, 3 *Black. Comm.* 158; and where a statute gives the right, without furnishing an adequate remedy to enforce such right, it is a part of the established jurisdiction of this court to lend its aid and furnish an effectual remedy where it cannot be had by a common law proceeding. Here the law has imposed a tax upon the defendant in respect of the estate of which he is the owner, to be collected for the benefit of the city and county in which he resides, and if the mode prescribed by the statute for the collection of the tax, is found to be ineffectual for that purpose, the common law, or the court of chancery, must supply the defect. Where a charge upon the person of an individual is created by statute, without prescribing the mode in which the payment of the charge is to be enforced, the common law gives an action of debt to recover the amount of the charge thus created. Thus, where a revenue law directs that goods imported shall be charged with certain duties, if the owner of the goods, or the importer, neglects to pay such charge, an action of debt will lie against him to recover such duties. *Atty. Gen.* v. *Strangforth, Bunb. Rep.* 96. *United States* v. *Lyman,* 1 *Mason's Rep.* 482. *United States* v. *Hathaway,* 3 *idem.* 324. *Meredith* v. *The United States,* 13 *Peters' Rep.* 486. Whether an action of debt would lie against the defendant in the case under consideration, to recover the amount of the taxes assessed upon him, after the supervisors had exhausted the remedy prescribed by the statute, is a question not material to be discussed here, as I am satisfied it was not necessary to bring a suit at

law, and exhaust the remedy by judgment and execution, before this court could have jurisdiction to compel payment out of the equitable assets and choses in action of the defendant.

The tax itself, after it had been legally assessed, was conclusive, as to the amount which the defendant was bound to pay. And the assessment of the tax and the issuing of the warrants to the collectors to levy the same out of the property of the defendant, and the return of such warrants unsatisfied, for want of visible property whereon to levy, was equivalent to the recovery of a judgment, and the return of an execution thereon unsatisfied in other cases. For by such proceedings the complainants have exhausted the remedy which the statute gives them against the property of the defendant. In analogy, therefore, to the proceedings by creditors' bills in other cases, I think the complainants had a right to come into this court for relief as soon as the collectors had made their return to the county treasurer in the mode prescribed by law, that the defendant refused to pay the taxes, and that he had no tangible property out of which such taxes could be levied upon the warrants delivered to them. I think, also, the allegations in the bill are sufficient to show the collectors had complied with every thing required by the statutes in making their returns to the county treasurer.

The remaining question is, whether the suit is properly instituted in the name of the supervisors of the county, instead of the county treasurer. Although the tax, when collected, is to be paid to the county treasurer, he does not appear to be the proper person to represent the county, as the complainant in a suit for its benefit. Under the provisions of the Revised Statutes, the liability and duty of the defendant to pay these taxes are to the people of the county in their corporate capacity, as their funds in the hands of the county treasurer are diminished to the extent of the taxes uncollected, as all the other officers to whom the taxes are payable are first to receive the amounts payable

**1841.**

Durant
*v.*
The Supervi-
sors of Albany
county.

to them for other purposes, and the balance is to be paid into the county treasury, for county expenses, 1 *R. S.* 396, § 37. The statute makes the county a corporation for certain purposes, and directs that all acts and proceedings by or against a county in its corporate capacity, shall be in the name of the board of supervisors, 1 *idem.* 364, § 1 & 3. It also authorizes the supervisors of a county to bring suits to enforce any liability or any duty enjoined by law to the body which they represent, 2 *idem.* 473, § 92. I conclude, therefore, that this bill was properly filed to reach the equitable interests and choses in action of the defendant for the payment of these taxes; and that the suit was rightfully brought in the name of the supervisors of the county of Albany, to the inhabitants of which county in their corporate capacity, the moneys due from the defendant for taxes belong. The decretal order of the Vice-Chancellor must, for these reasons, be affirmed, with costs, and the proceedings are remitted to the Vice-Chancellor.

The defendant appealed from the decision of the Chancellor to this court, where the case was argued by:

*S. Stevens,* for the appellant.

*J. Van Buren,* for the respondents.

*Points submitted and argued on the part of the appellant:*

I. No bill or suit in equity can be sustained upon the case made by the bill in this cause.

1. The assessment and collection of taxes are creations of, and regulated by the statute. No means of collection can be resorted to, except those prescribed by statute.

The legislature has given all the remedies it deemed necessary or proper, to enforce the collection of taxes, and it has not thought proper to make either the courts of law or equity the instruments for that purpose, except in a few special cases, and those cases would not have been provided for by statute, if the courts had the power without it. 1 *R. S. p.* 396, § 36-7, *1st edit.* 397-8, § 1 *to* 5. *Statutes*

*of* 1826, *p.* 197, § 33: *p.* 196, § 31. *Statutes of* 1833, *p.* 360, § 21-2-3.

2. This case does not come within the statutory provisions authorizing bills in equity by judgment creditors. 2 *R. S.* 173, § 38,39, 1*st. edit.* 1st. That statute is special, and applies only to *judgment* creditors who have exhausted *all their remedies at law.* 2d. The complainants in this case are not *judgment* creditors of the defendant, (nor indeed, as we humbly insist, creditors at all,) they have no judgment—no execution returned unsatisfied.— 3rd. Prior to 1830, the court of chancery had no such jurisdiction as that given by the Revised Statutes in favor of *judgment creditors,* and could grant no such relief. To authorize the interference of a court of equity in such a case, a case of equitable jurisdiction must be shown, such as trust, fraud, &c. *Donovan* v. *Finn, Hopkins' Rep.* 59.

II. But if such a bill as this can be sustained at all, the Board of Supervisors are not the proper complainants.

I. Such a bill can only be sustained by the party to whom the money is due, or who will be entitled to its custody when collected as owner or trustee for some other person.

2. The debt sought to be collected by this bill is not a debt which the defendant owes to the supervisors, nor will they have any right or claim to it when collected; nor are they in any manner entitled to the custody of it, as agents, trustees, or otherwise. 1 *R. S. p.* 396, § 36-7-8, (1*st ed.*); 398, § 6; 399, § 10; 400, § 13 *to* 19-20; 403, § 28.

3. No power vested in, or duty imposed upon the Board of Supervisors by law, will enable them to sustain this bill. 1st. It is not authorized by the provisions in the the 2 *R. S. p.* 473, § 92, (1*st. ed.*) *First.* That statute only authorizes *actions* at law, and does not authorize the filing of a bill in equity. *Second.* This bill is not founded upon any cause of action mentioned in that statute. *Third.* A bill in equity could not be sustained upon any of the causes of action mentioned in those provisions of the statute.

2d. It is not authorized by the provisions in the 1 *R. S.* 384, § 1 *and* 2, (1*st. ed.*)   *First.* Those provisions relate to suits by and against counties in their corporate capacity, and can have no reference to taxes.   *Second.* The county, in its corporate capacity, has no right whatever to the taxes assessed and collected in the several towns in the county; nor is the county, in its corporate capacity, entitled to the custody of the money when collected.   It could not be sued for the money by any person entitled to it after it was collected, nor is it in any manner responsible for the collection of the taxes.

3d. The provisions of 1 *R. S.* 364, § 3 *and* 4, (1*st. ed.*) do not authorize the Board of Supervisors to sustain this bill.   *First.* Those provisions manifestly do not relate to suits of any kind.   *Second.* The county has no right to this money, for the reasons before mentioned, and therefore could sustain no suit for it in its corporate capacity.

4th. If such a bill as this can be sustained at all, the *county treasurer* is the proper party complainant.   He is the person entitled by law to the custody of the money— he holds it for the benefit of all interested in it.   He is the only person authorized to receive it, or take any steps to enforce its collection, after the warrant has been delivered to the collector.

III. If there is any remedy in this case beyond that given by the statute, that remedy can be obtained at law; consequently there is no jurisdiction in equity, especially until the remedy at law has been exhausted.

1. If these taxes are to be deemed a debt due from the defendant to the complainants, the payment of which may be decreed in equity, an action at law can be sustained and judgment recovered for the amount.

2. The remedy at law has not been exhausted.   1st.   The real estate of the defendant could be sold on an execution upon a judgment at law recovered for these taxes, which can not be done on a collector's warrant.   Whether there is real estate or other property that could be reached by

execution, can only be determined by the issuing and return of an execution at law. *Brinckerhoff* v. *Brown*, 4 *Johns. Ch. R.* 676–7. No steps have been taken by the complainants to enforce such a remedy.

2d. It is not shown by the bill that the remedy given by the statute has been exhausted. If the collector is unable to collect any of the taxes, the statute requires him to make an affidavit of that fact, and present it to the county treasurer, and the treasurer is then authorized to exonerate the collector from that amount; and unless such affidavit is made, the collector is liable for the whole amount directed by his warrant to be collected. 1 *R. S.* 399, § 10 *and* 13, (*1st. ed.*) No such affidavit has been made in this case. It does not appear, therefore, in the only way in which the statute requires such fact to appear, that these taxes could not have been collected. When the complainant can have any remedy at law, he must show that he has pushed that remedy to every available extent—that he has exhausted it, before he can resort to a court of equity. *Brinckerhoff* v. *Brown*, 4 *Johns. Ch. R.* 671.

*Points presented and argued on the part of the respondents :*

I. The respondents show a clear title to the amount they claim from the appellant, and a failure of the remedies at law to procure satisfaction of their claim.

1. It is upon such grounds that a court of equity interferes in cases of judgment creditors. *Wiggins* v. *Armstrong*, 2 *Johns. Ch. R.* 144. *Hendricks* v. *Robinson*, 2 *Id.* 283, 296. *Hadden v. Spader*, 5 *Johns. Ch. R.* 280; 20 *Johns. R.* 554, *S. C. Tarbell* v. *Griggs*, 2 *Paige*, 207. *Brinckerhoff* v. *Brown*, 4 *J. C. R.* 671. *Mountford* v. *Taylor*, 7 *Ves.* 787. *Mitford's Pl..* 126. *Edmeston* v. *Lyde*, 1 *Paige* 637. 2 *R. S.* 173, § 38.

2. The assessment, the extension of the tax and the issuing of the warrant, entitle the complainants to the same aid from this court, that they would be entitled to under

an ordinary judgment and execution. 1 *R. S.* 392, § 15; 399, § 10.

3. It is not necessary that a party should exhaust every *possible* legal remedy before resorting to the aid of a court of equity. *Legget* v. *Hopkins, et al.,* 7 *Paige* 149. *Childs* v. *Brace,* 4 *Paige* 309. *Corporation of Carlisle* v. *Wilson,* 13 *Ves.* 275. *Mayor of Reading* v. *Winkworth,* 5 *Price* 473. *Cupit* v. *Jackson,* 13 *Price* 721. *Green* v. *Barrett,* 1 *Sim.* 45.

II. The taxes claimed by defendant in this case belong to the people of the county of Albany, in their corporate capacity, and the bill is therefore properly filed in the name of the Board of Supervisors of Albany county. 1 *R. S.* 364, § 1, 3. *Id.* 384, § 1. 2 *R. S.* 473, § 92.

1. The direction and control of the corporate property; the auditing, settling and allowing county and town accounts, and the raising such sums as are necessary to defray both, belong to the Board of Supervisors. 1 *R. S.* 367, § 4, 385, § 3, 4 *and* 5.

2. The warrant to collect the taxes is issued by the Board of Supervisors, and they direct what shall be done with the moneys collected. 1 *R. S.* 396, §36, 37.

3. The county treasurer is obviously the mere agent of the Board of Supervisors, under their absolute direction, and with no interest at all in the subject matter in dispute —an admission that the bill ought to be filed by him, is a surrender of the objection that the supervisors are not the proper parties complainants.

After advisement, the following opinions were delivered:

Mr. *Justice* COWEN considered the case within the equity of the statute allowing *creditors' bills* after the return of executions unsatisfied. That statute, he said, is remedial, and should be construed by its equity. He referred to *Dwarris on Statutes,* 718 *to* 721, where numerous cases are collected wherein remedial acts have been extended to

cases and persons not within the words of the acts. He
also mentioned *Simonton* v. *Barrell*, 21 *Wendell* 362,
where a statute authorizing a *new execution* or other *pro-
cess* after the discharge of a defendant from arrest on a *ca.
sa*, was held to authorize *an action of debt* on the judg-
ment.

He also examined the objection that the proper parties
had not sued; and concluded by observing, that though the
question was not free of difficulty, the balance of the law
was in favor of the decree, and he was of opinion that it
should be affirmed.

By *Senator* HUMPHREY. I have examined this case
with the care required by the important question it involves.
The object sought by the complainants is to enforce the
payment of the ordinary taxes, imposed on the defendant
for the support of the government. His ability to satisfy
the charge is conceded. His obligation to do so cannot
be denied. His refusal to pay is alleged and admitted;
and the question arises whether he can be compelled in the
mode now proposed to fulfil the duties imposed upon every
citizen, and to contribute his quota to the maintenance of
the government under which he lives. The decision of this
question is important in every aspect, and particularly so
in its bearing upon the financial condition and resources of
our state. The case presented is a single instance, but it is
easy to foresee that if it be successful it may have many
imitations.

I cannot concur in the apprehensions which have been
expressed as to the extension of the jurisdiction of the
Chancellor. His decisions may all be reviewed by us to
a much greater extent than the decisions of the supreme
court, and it is much more important to inquire whether
he has acted well and wisely in a given case, than to cen-
sure him for having acted at all. I agree with the counsel
for the appellant that there is no remedy at law for the
collection of these taxes. The authorities cited by him

**1841.**

Durant
*v.*
The Supervi-
sors of Albany
county.

seem fully to maintain his position, that where a right is given by statute, and a remedy for the violation of it is prescribed at the same time, the statute remedy and no other must be pursued. It follows that the complainants were right in pursuing the statute remedy, as they have done to every available extent, and that they cannot bring an action at law to recover the amount of these taxes and that therefore all the legal remedies of the complainants are exhausted. This brings the case to the question which the Chancellor says it presents, viz: " whether a wealthy individual, taxed on account of his personal estate, can escape from his liability for the payment of the tax, if he thinks proper to invest his funds in bonds and mortgages, or other property which cannot be distrained or sold under the supervisors' warrant to the collector." Can then, the payment of taxes be evaded in this way ? If it can, the rule will work very unequally. The farmer, whose implements of husbandry, and the mechanic the tools of whose trade can be seized by the tax gatherer, will not only pay their own taxes, but will be obliged to make good the deficiencies of those who have thousands of dollars at interest but no property tangible by a collector's warrant.

The complainants insist that their claim should be regarded as analogous to a judgment, and that the same relief should be extended to them, on a failure to collect, by virtue of the collector's warrant, as the statute extends to judgment creditors in certain cases. 2 *R. S.* 173, § 38. It is admitted that this case is not within the *terms* of the statute, but the complainants urge that the Chancellor had the same jurisdiction which the statute gives, previous to its enactment, or that at all events the statute is remedial and should be extended to this case by analo·gy. It is obvious from an examination of the cases cited on both sides, that long previous to the Revised Statutes, Chancellor Kent repeatedly claimed a power as existing in the court of chancery, to decree that an execution re-

turned unsatisfied, on a judgment at law, should be satisfied out of the defendant's equitable effects: not on the ground of fraud or trust, but as a distinct branch of equity jurisdiction. 2 *Johns. Ch. R.* 283, 296; 4 *Id.* 687. And that in this view of the law he was sustained by the late Chancellor Lansing, Chief Justice Spencer, and Judge Woodworth. See *Hadden* v. *Spader*, 20 *Johns. R.* 554. Although Chancellor *Sanford* refused to exercise this power, yet his successor, Chancellor Walworth, has repeatedly exerted it. 1 *Paige* 637; *Id.* 168, *and* 2 *Id.* 207. And this court have adhered to the opinion delivered by Judge Woodworth in *Hadden* v. *Spader.* In *Candler* v. *Pettit*, 1 *Paige* 168, Chancellor Walworth exercised this power, and although a portion of this court, when the case came before them, 3 *Wendell* 618, refused to express an opinion on the point, yet *Senator* ALLEN, whose strong common sense always gives great weight to his opinions, remarked as follows: " There are several cases in which the principle has been clearly recognized that a court of chancery has the power to compel the discovery of personal property, placed by the debtor beyond the reach of legal process; and I am unable to discover any good reason, and the counsel for the appellant has adduced none, why public stocks, notes of·hand, bonds or debts of any kind, should be exempt from execution any more than other estate, whether real or personal, or why the effect of a judgment should be defeated, while the debtor may be in possession of a large property of the kind alluded to. That the principle of compelling a discovery and account of such property has been acted on by our equity courts appears from the case of *Kendrick* v. *Robinson*, 1 *Johns. Dig.* 205, where it was held that Chancery will lend its aid to a judgment creditor, by compelling a discovery and account against a debtor or third person, who had possession of the debtor's property, and placed it beyond the reach of legal process. The same is the case of *Hadden* v. *Spader*; and so important has the principle been deemed

*margin:*
1841.

Durant
v.
The Supervisors of Albany county.

1841.

Durant
v.
The Supervisors of Albany county.

by the legislature, that it has been incorporated in the Revised Statutes, which go into effect on the first of January, 1830. The justice and equity of this rule appears to me indisputable, for what can be more reasonable than that every man possessing the means should pay his honest debts; and if he possess the means and place them in a situation beyond the reach of legal process, is there any injustice in compelling him to render an account of the property thus fraudulently concealed? The provisions of the insolvent laws of this state, and the practice under them gives good reason to fear that acts of concealment are by no means uncommon, and it is of importance to the morality of the community, that our courts of equity should be sustained in their endeavor to arrest this growing evil." The very eminent counsellors also who revised the laws, in reporting the sections in regard to judgment creditors, observed, "This section and the last are founded on the decision of Chancellor Kent, and of the court of errors in the case of *Hadden and Spader*, 5 *Johns. Ch. R.* 280; 20 *Johns. R.* 554. The doctrine established in those cases has been doubted, and qualified in a subsequent case in the court of chancery, *Donovan* v. *Finn*, 1 *Hopkins R.* 59; but it is understood that it is still adhered to in the court of errors. Deeming it important to settle the law and to preserve the rule as laid down in the case of *Hadden and Spader*, the revisers have proposed the above sections." If then it be true that this power resided in the court of chancery previous to the Revised Statutes, we are not confined to the terms of the section quoted in determining the powers of that court. The same features that distinguish the case of a judgment creditor, are present here. The amount and validity of the complainants' demand are indisputably established, the defendant having neglected to appear before the assessors, can no where controvert the claim; the lien on the personal property, out of which satisfaction is sought, is fixed more firmly than by an execution, for the property cannot

be replevied; and the legal remedies are exhausted by re- **1841.** peated experiments and failures to collect. But even if we were left to the statute, I am of opinion we ought to extend the benefits of its provisions to a case like this, which is precisely analogous.

It is urged, however, by the defendant's counsel, that the English court of chancery has not this power. This may be true. In England, imprisonment for debt exists, and is a much more effectual mode of compelling the payment of debts. They have not even thought proper there to enact the law we have on that subject. They go much farther than we do, too, in protecting the property from the reach of the creditor by means of trusts. They fetter the alienation of real estate by entails, and in, short, it is a part of the English system of government to preserve to a privileged class a certain dignity and rank, sometimes even at the expense of creditors. Here, on the contrary, the first principle of law and government is equality, and the first and highest obligation of every citizen is to pay his honest debts according to his ability, and when he refuses to do so, the law should compel him.

The objection, that the bill should have been filed in the name of the county treasurer, does not strike me with much force. These taxes belong to the people of the county of Albany in the aggregate. It is true, the deficiency occurs in the *first* and *third* wards of the city of Albany; but the collectors of those wards are exonerated by the return of the warrants to the county treasurer, and there is no law providing how the deficiency shall be made good. The loss then is so much subtracted from the aggregate means of the county; and it seems to me, the supervisors are the proper parties to be made complainants. Even if the county treasurer might file a bill, he could do so only in behalf of the people of the county. The injury is to the people of the county in their corporate capacity; and the statute directs that all proceedings by or against a

1841.

Durant
*v.*
The Supervi-
sors of Albany
county.

county in its corporate capacity, shall be in the name of the board of supervisors, 1 *R. S.* 364, § 1 & 3.

On the whole, I should extremely regret to disturb the Chancellor's decree in this case, as it appears to me, that substantial justice has been done. He has held a defaulting citizen to his duty. If he has erred as to his jurisdiction, he has erred with those great legal luminaries, Kent, Spencer, Lansing, Duer and others. We cannot be far wrong in following the course that these bright lights point out; especially when, in so doing, the end we reach is manifestly right.

I shall, therefore, vote for affirming the Chancellor's decree.

By *Senator* VERPLANCK. The questions raised in this argument are not new to me. The defect or oversight in our law for the collection of taxes, which has caused this suit, was brought to my notice during the last legislative session of the senate, in consequence of gross instances of advantages taken by wealthy men having no tangible property, to escape the payment of their just taxes. I could then perceive no remedy but in legislation, and prepared a bill, declaring such refusal to be a contempt of the sovereign power, and subjecting the offending party to the provisions of the statute in relation to contempts, upon oath of the collector and application of the supervisors to the county court. The press of business at the end of a long and laborious session prevented the progress of the bill.

Perhaps the law is quite as well as it stands; for if the Chancellor is right as to his jurisdiction on the subject, the mild and parental discipline of a bill in chancery may be as effectual a remedy against wealthy delinquents as any other that can well be devised.

I had much hesitation on the point of the jurisdiction of chancery over this matter. Our court of chancery has by statute, 2 *R. S.* 102, the power and jurisdiction of the

court of chancery in England. From an early period of
the English chancery, an authority, independent of any
statute, to enforce common law judgments when property,
held in trust or otherwise, could not be reached by execu-
tion, has been recognized in judicial opinions and applied
in practice. These decisions and opinions (which will be
found cited and commented upon in the cases on the same
point in our own state reports) have been considered by
Chancellor Kent, Chief Justice Spencer and Judge Wood-
worth, as asserting and applying the original and indepen-
dent power of chancery to supply, by its " assistant juris-
diction," the inadequacies of legal and statutory remedies.
Yet, in some later cases, the exercise of such a power was
denied by the English courts where the legal remedy had
failed. I will not inquire how far the decisions on either
side may have been governed by other circumstances, (as
trusts, frauds and the like,) without regard to the question
of mere inadequacy of legal remedy, giving a supplement-
ary or assistant jurisdiction (as it has been termed) to
chancery. But there is authority on both sides of that
question; that of Lords Nottingham, Hardwicke and Redes-
dale, against Thurlow, Eldon, Manvers and Best. I am
familiar enough with the antinomies of our jurisprudence
to smile incredulously at the attempts so often made to
reconcile contradictory decisions and vindicate juidicial
infallibility. I cannot consider the statute of this state,
authorizing creditors' bills in chancery, upon judgments in
courts of law, as giving jurisdiction to enforce unsatisfied
warrants for the collection of taxes, even upon a far more
lax interpretation of statutory language than it is my wont
to give to legislative enactments; but I find that the deci-
sion of our own courts in *Hadden* v. *Spader*, 20 *Johns. R.*
564, upon which the provision of the Revised Statutes was
expressly founded, is stated by the reporter to have been
in declared concurrence with the opinion there delivered
by Judge Woodworth, to which Chief Justice Spencer gave
his assent. It is that opinion then, and not that of Judge

*1841.*

Durant
*v.*
The Supervi-
sors of Albany
county.

1841.

Durant
*v.*
The Supervisors of Albany county.

Platt, who came to the same result of affirmance upon other reasons, that forms the law of that case. That opinion recognizes, before our present statute, the essential authority of chancery to enforce, by its peculiar process and powers, the rights of judgment creditors against debtors, whose property could not be reached by common law process or statutory remedies. Our Revised Statute on that view of the subject is, therefore, but a more specific and guarded re-enactment of the law as then understood in its most useful and ordinary application, and so the revisers considered it. They recommended it in consequence of the doubts raised by the very able opinion of Chancellor Sanford in *Donovan* v. *Finn, Hopkins R.* 59. But the principles of that decision apply to most cases where the common law remedy for the collection of any debt, or that given by statute is inefficient, and would clearly reach the one before us, so as to bring it within the assistant jurisdiction of the court of chancery. It comes evidently within the spirit and understanding of that decision on the grounds upon which the majority of this court placed their opinion. It is, therefore, entitled to great, if not conclusive weight in the decision of the present case, since, (to use the words of a great chancellor, Lord Redesdale, 1 *Schoales & Lef.* 429,) " Courts of equity decide new cases upon the principles on which former cases have been decided, and may thus illustrate or enlarge the operation of these principles."

Various decisions of Chancellor Kent, before the statute, assert the same assistant jurisdiction of chancery to supply the defects of common law or statutory process by means of creditors' bills. The present Chancellor has repeatedly held and applied the same doctrine. In *Beck* v. *Burdett*, 1 *Paige R.* 307, and in *Edmeston* v. *Lyde, Id.* 637, he exercised this power in enforcing judgments at law before the statute had been passed, recognizing such a remedy. In *Tarbell* v. *Griggs* 3 *Id.* 207, he said that " it had been repeatedly decided, that the rule in the Revised Statutes is

not introductory of a new principle, but is only in affirm-
ance of what was considered in the court of dernier resort,
the legitimate jurisdiction of chancery previous to the sta-
tute." He, therefore, did not hesitate afterwards, in
*Clarkson* v. *De Peyster et al*, 3 *Paige R.* 320, and in
*Speiglemyer* v. *Crawford*, 6. *Paige R.* 254, to give the
same aid to a creditor by *decree in chancery*, although the
statute speaks only of *judgments at law.*

It may be said that all this amounts to no more than
the Chancellor's own authority in former cases for his pre-
sent opinion. But for twelve years, since 1829, this doc-
trine has been repeated and applied so often, and that in
conformity with former decisions of Chancellor Kent, as to
form the law of our court of chancery; whilst during these
twelve years, the application of the rule has never been
contested by an appeal. I think, therefore, that the au-
thority and usage of our court of chancery, sustained by the
opinions of the judges in the highest appellate court, have
now established the original authority, independent of any
statute, of our court of chancery to grant relief to creditors
whose rights are established in other jurisdictions, where
the remedies to enforce these rights (as executions, &c.)
are ineffectual. Were such authority in contradiction to
any principle of natural justice or the express direction of
any statute, it might not be regarded as conclusive against
a review in this court, since the decision in *Spader* v. *Had-
den* did not of necessity involve this point. But the au-
thority and usage regard merely the practice and process
of the court, and furnish a mode of enforcing just and un-
questionable rights, which has hitherto been found condu-
cive to the ends of justice, and must continue to be of fre-
quent utility, until the legislature shall furnish the common
law courts with similar remedies.

Such an extension of jurisdiction is of a character by no
means open to the objections hitherto made by the champi-
ons of our ancient common law, its decisions of law and fact,
and its decisions by judge and jury, to the enlargement of

**1841.**

Durant
*v.*
The Supervi-
sors of Albany
county.

1841.

Durant
*v.*
The Supervi-
sors of Albany
county.

chancery authority. This does not intrude on the province of a jury to pass upon disputed facts: nor sweep within the widening and still widening whirlpool of chancery jurisdiction, questions of private right, such as could be more satisfactorily and economically decided in the courts of common law. It is simply the application of its peculiar process and power to enforce rights already established in substance, in the manner directed by the common or statute laws.

I moreover strongly incline to the opinion that this application of the peculiar power of chancery to enforce the law for the collection of taxes, may be justified under the allowed jurisdiction of equity over *fraud.* Whoever having property sufficient to pay his acknowledged debts, takes advantage of lenient or defective laws, omitting to place property of certain kinds within the reach of ordinary process, commits a constructive fraud at least; he is guilty of an evasion of law, a subterfuge from duty. If such reason ever gives authority to enforce a common law judgment upon property intangible by other process from the constitution of the court itself before the statute, *a fortiori,* does it do so here. This is not simply a refusal to pay a debt. Such a refusal may be either because a man denies that the debt is justly due, or because he cannot pay it, and in either case without any admission of wrong doing. But here the assessment not having been attempted to be corrected according to law, nor expressly denied to be just and fair, proves at once, that the appellant *ought* to pay and can pay his taxes. This indeed is not *literally* a fraud—such as a deceit, a false representation, a breach of trust; but it is in the nature of a fraud in the eye of the law as much as many other acts which without active and positive criminality are yet for reasons of public policy or from the undue advantage taken, nevertheless classed with the *dolus malus* of the civil law, and the legal *fraud* of our own equity system. Thus Judge *Story,* in his general definition of fraud, says that " in the

sense of a court of equity, it includes all acts, *omissions* or concealments, which involve a breach of legal or equitable duty, trust or confidence, and are injurious to another, or by which an undue advantage is taken of another." 1 *Story's Equity* 197; and in his explanation of *Constructive Fraud*, he represents it as including " such acts as though not *originating* in any actual design to perpetrate a positive fraud or injury upon other persons, are yet by their *tendency* to deceive or violate *public* or private confidence or to impair or to *injure the public interests*, deemed equally reprehensible wtth positive fraud, and are prohibited by law as within the reason and mischief as much as contracts made *malo animo*. 1 *Story Eq.* 261.  The equity reports abound in examples and judicial authorities for these expositions of our eminent commentator.  They all recognize the principle applied to analogous cases by *Lord Redesdale*, and stated by him with his usual force and clearness in *Bond* v. *Hopkins*, 1 *Sch. and Le Froy R.* 430:  " Nothing is better settled in courts of equity, than that where a title exists at law and in conscience, and the effectual assertion of it at law is unconscientiously effected, relief should be granted in equity; and when a title exists in conscience, though none in law, relief should also be granted in equity."

If in opposition to this view, it is suggested that the bill here does not charge fraud *eo nomine;* it is to be observed that it states and demands relief against conduct amounting to an evasion of the law of the land; and if facts distinctly charged, amount to positive or constructive fraud, that is surely enough to enable the court to entertain jurisdiction without the use of specific and technical terms.  I know of no decision where a rule has been laid down so much in hostility to the spirit and sense of equity proceedings, as to demand the application of a charge in technical language to support its jurisdiction, when sufficient facts are set forth.  A case is made by the *stating* part of the bill, and the jurisdiction of the court depends

1841.

Durant
*v.*
The Supervisors of Albany county.

1841.

Durant
v.
The Supervisors of Albany county.

upon what is there set forth. It is doubtful whether the *charging* part is not entirely unnecessary. Lord Eldon says, in *Partridge* v. *Haycraft*, 11 *Vesey*, 574, " Formerly the bill contained very little more than the *stating* part. I have seen such a bill, with a simple prayer, that the defendant may answer all the matters aforesaid; and then the prayer for relief. I believe the interrogating part had its birth before the charging part. Lord Kenyon never would put in the charging part, which does little more than unfold and enlarge the statement." Indeed, some decisions in the appeal court of Kentucky (read on argument) positively assert the opposite rule. *Rodes' Exrs.* v. *Bush*, 5 *Monroe*, 467. *Opinion of C. J. Bibb at page* 474.

As the board of supervisors have by law the general control of the corporate property of the county, the suit seems rightly brought by them. The statute gives them the right to maintain *actions*. It does not say *actions at law*; but though the word " actions " is commonly used for suits *at law*, it does not exclude suits in equity. All the definitions most familiar to lawyers give great latitude to the word. The old definition of *Bracton*, drawn from the civil law, and that of Lord *Coke*, have been kept alive, and made familiar by constant quotation: an action, according to *Bracton*, is, *nihil aliud quam jus prosequendi in judicio quod sibi debetur*, or according to Lord *Coke*, " a legal demand of one's right." Blackstone (3 *Comm*. 3,) considers it " a remedial instrument of justice, whereby redress is obtained for any wrong committed or right withheld." Finally, *Sellon*, the most learned of the English writers on the practice of the courts, says that it is " the method prescribed by different statutes *or by the rules and practice of the respective courts*, for the recovery of any debt due, or of an equivalent in damages for any injury sustained." 1 *Sellon's Pr. Introd*. 72. Actions at law as the most likely to be maintained, were probably primarily in the contemplation of the legislature, but neither the intent of the law

nor the literal meaning of the words indicate, that that primary object was the exclusive one.

The right of the county treasurer to the custody of the money may very probably give him also similar authority to sue in equity; but I know of no reason why such a right to sue, either in law or equity, should be exclusive in either set of officers, who are both, in different ways, trustees or legal agents for the same public body—the county.

I shall vote for affirmance.

*Senator* Root protested against the court of chancery entertaining jurisdiction in this case. The act allowing *creditors' bills* was an alteration of the common law as it existed at the time of its passage. It created a remedy before unknown, but it was limited in its terms to *judgment creditors;* and now it was sought to increase the jurisdiction of the court of chancery by construction—by bringing the case of an unsatisfied collector's warrant for taxes within the equity of the statute. It had been said no remedy had been provided by the act for the assessment and collection of taxes for a case like this, and therefore chancery should yield its aid to supply the defect in the act; but he would rather the legislature should provide the remedy than permit the dangerous plea of necessity as an apology for the extension of the jurisdiction of the court. The legislature may direct the re-assessment of unpaid taxes and authorize a *warrant* against the person of a citizen able but unwilling to bear his share of the public burdens. He said he would vote for a reversal.

By *the* President *of the Senate.* If the case now presented to this court embraced merely the question whether a wealthy individual, taxed on account of his property for the support of government, should be permitted to escape from his liability to pay such tax, it would be of easy decision. The conduct of such an individual, enjoying for himself and his property the protection of the government

of his choice, and yet endeavoring to evade the payment of his just proportion of the expense of that government— participating equally with others in its blessings, and yet refusing to share its burdens, cannot be characterized in terms of too severe reprehension. Such conduct should not merely receive the opprobium it merits, but be visited by the most rigorous penalties which the laws permit. Such, however, I apprehend, is not here the true question. That is one mainly of jurisdiction, and like all others of that nature, while it receives a fair, should at the same time receive a strict interpretation and decision. I shall, therefore, proceed to consider first the question : Whether our court of chancery has jurisdiction of the case presented in the bill filed in this cause ? If such jurisdiction exist, it must be either, 1st. At common law; or 2d. By virtue of the statute.

First, then: Had our court of chancery such jurisdiction at common law ? In examining this point I shall consider this case, as it has been presented, as analagous to that of an ordinary judgment creditor, having issued execution and had it returned unsatisfied. I shall afterwards distinguish between such a case and that now before the court. The present powers and jurisdiction of the court of chancery are the growth of nearly four centuries and a quarter. He who would form an accurate judgment of their present asserted extent, would look in vain to their anciently restricted limits, when Henry Beaufort, son of John of Gaunt, was conscience keeper of the 3d Henry of England, in the early part of the fifteenth century. Even at a much later period, when the powers and proper prerogatives of the court had become more settled and better understood, they were confined within comparatively narrow limits. Lord *Coke,* in his *4th Institutes, Chap.* viii, *page* 84, limits the jurisdiction of chancery to the three following heads, and in the following terms: " For this court of equity the ancient rule is good. Three things are to be judged in court of conscience: 1. Covin. 2. Accident; and 3. Breach

of confidence." Under these three general *heads of equity* are embraced all matters then deemed properly cognizable in a court of chancery. This ancient rule was early recognized as good by Sir John Popham, Chief Justice, and the other Justices of the King's Bench, in the case of the *Earl of Worcester*. It would have been fortunate if this court had practically confined itself within this clearly defined, legitimate and acknowledged jurisdiction. But so constantly has been its tendency to transcend these restricted limits; so silent but gradual its encroachments upon the safer, because more fixed and certain, prerogatives of the courts of law, that the boundary of its powers has become so shadowy and uncertain as to render it a matter of doubt what is, and what is not, within the grasp of its present asserted and ever expanding jurisdiction. So variant, even in England, has been the rule upon the subject; so contradictory the decisions of her courts; and so different at different periods, the acknowledged jurisdiction of the court of chancery, that even so late as 1822, Judge *Platt*, in the case of *Hadden* v. *Spader* in this court, and Chancellor *Sanford* in that of *Donovan* v. *Finn*, in his own court in 1823, felt themselves at liberty to decide those cases upon principle, as cases of first impression. Certain general principles, however, applicable to this subject had become settled, and had been pretty uniformly adhered to. To some of these it may be well to refer.

One of the earliest and safest general rules of chancery jurisdiction, as laid down by Lord *Coke*, is, that " *matters determinable by the common law, cannot be decided in equity*." While the soundness of this, as a general rule, is universally admitted, it by no means follows, of course, that the converse of this proposition is true, namely: that *matters not determinable by the common law may be decided in equity*. I know that this latter idea seems to be a favorite one with the sticklers for equity jurisdiction. They seem to claim that whatever is not within the legitimate jurisdiction of some of the courts of common law, must of

*1841.*

Durant
*v.*
The Supervisors of Albany county.

1841.

Durant
v.
The Supervisors of Albany county.

course be within that of the court of chancery. Our Chancellor, in the case now under consideration, would seem to recognize this principle when he says: " where a statute gives the right, without furnishing an adequate remedy to enforce such right, *it is a part of the established jurisdiction of this court* to lend its aid and furnish an effectual remedy, where it cannot be had by a common law proceeding." Now this is a very pregnant proposition, and seems to me to be fraught with great danger. Indeed so broad and expansive is its principle, as to cover almost every actual or supposable assumption of equity jurisdiction and powers. With great deference to the learned Chancellor, who has thus put forth this principle, it would seem to me that in a case coming under no general head of equity, and presenting no fact or incident of equitable cognizance to give it jurisdiction, for the court of chancery to interfere merely to eke out a defective jurisdiction of the courts of common law, would be to exercise legislative rather than judicial powers. It would be the assumption of *new* rather than the exercise of *established* jurisdiction. Such, too, with great respect, I apprehend not to be the well established rule of law. That rule, as drawn from principle, and deduced from the adjudications of courts, I understand to be: 1. Where the statute creates a new right, unknown to the common law, and gives no remedy for the enforcement of such right, there common law remedies attach; and 2. Where the statute creates a new right unknown to the common law, and gives a remedy, there he, who would claim the right of the statute, must pursue the remedy of the statute. Nor is the remedy given by the statute in the latter case merely cumulative or ancillary, as is pretended, but exclusive. In *The King* v. *Penracks,* and in *The King* v. *Malard,* in the 2nd. of G. 2, it was held, " that an indictment will not lie where an act of parliament makes a new offence and prescribes a particular method of proceeding," So, too, in *The King* v. *Wright,* Lord Mansfield, Chief Justice, and justices

Denison and Wilmot, also held, " that no indictment will lie where a statute creates a new offence, and gives a particular remedy." In the case of *Stevens* v. *Evans*, Justice Denison, Wilmot concurring, held, " that upon a new statute which prescribed a particular remedy, no remedy can be taken but the particular remedy prescribed by the statute." Subsequently, Lord Kenyon and other judges, agreed, that " where the legislature has given a specific remedy, *that*, and no other, can be resorted to." If that remedy be insufficient, the legislature, and not the court of chancery, must supply the defect. " If the remedies of the law are imperfect, equity, as has been often said in the courts of England, has no jurisdiction to give execution merely in aid of the *infirmity* of the law." Among the judges of our own country, Chief Justice Parsons, in *Smith* v. *Drew*, 5 *Mass. R.* 514, lays down the rule as follows: " Where a statute creates a new right, without prescribing a remedy, the common law will furnish an adequate remedy to give effect to the statute right; but where a statute has created a new right, and has also prescribed a remedy for the enjoyment of the right,, he who claims the right, must pursue the statute remedy." Judge Sedgwick, in *Gedney* v. *the Inhabitants of Tewksbury*, 3 *Mass. R.* 307, had previously said, " where a statute gives a right, and furnishes a remedy, that remedy must be pursued." The rule laid down in these propositions seems to me very sound; and it is not more sound than it is directly applicable to the case in hand.

But it may, perhaps, be objected, that these rules leave the case of a statute right, and an imperfect statute remedy, without effectual relief; and that the familiar saying, that " *every right has a remedy*," would, therefore, become the mere dictum of a beautiful theory, rather than an operative principle and useful reality. To this I would answer in the language of Chancellor Sanford, in which he has well said that, " The maxim that *every right has a remedy*, and that where the law does not give redress,

equity will afford relief, however just in theory, is subordinate to positive institutions, and cannot be applied, either to subvert established rules of law, or to give to this court a jurisdiction hitherto unknown." To this I would merely add, that in many cases the legislature, and not the courts, ·can alone furnish to existing rights effectual remedies.

The ordinary cases, in which a court of chancery, in the exercise of its appropriate powers, and within its own proper and legitimate jurisdiction, might, previous to 1830, interfere in aid of a judgment creditor, may be comprised under the two general classes following:   1. To compel a discovery of property improperly concealed, or withdrawn from the creditor; and which, when discovered, may be taken in execution at law; and 2. To remove impediments, either created by equity or interposed by fraud, to the due course of proceedings at law.   It is believed, that previous to the Revised Statutes of 1830, the cases, in which our own court of chancery interfered to relieve judgment creditors, were all embraced in these two general classes; and were, of course, all cases of acknowledged equity jurisdiction.   They all came under some general head of equity.   The case of *Bayard* v. *Hoffman*, 4 *Johns. Ch. R.* 450, was a case of fraud, trust, and a conveyance without consideration; that of *Brinckerhoff* v. *Brown*, *Id.* 671, was a case of fraud; that of *McDermot* v. *Strong*, *Id.* 687, was a case of trust; that of *Hadden* v. *Spader*, 5 *Johns. Ch. R.* 280, and 20 *Johns. R.* 554, *S. C.* was a case of trust and fraud; and the case of *Pettit* v. *Candler*, 3 *Wend.* 320, was also one of trust and fraud.   These are the leading cases in our own courts previous to 1830; and it will be seen, on examination, that they all embrace some general head of equity, and are thus within the legitimate jurisdiction of chancery.   In neither of them was there an attempt on the part of the court, without facts or incidents of equitable jurisdiction, to discover and apply to the payment of the debt of a judgment creditor, stocks, credits, choses in action, or equitable interests, not tangible by

execution at law. In general, the court interfered to remove some impediment which *fraud* had interposed, which obstructed the due course of law, and prevented the recovery of a just debt.

It is true, that in the case of *Hadden and Spader*, the learned member of the court of errors, who delivered the leading opinion, did advance a doctrine which carried the jurisdiction of chancery beyond its former recognized limits, and extended it to the discovery and application of choses in action and equitable interests, which could not before be levied upon by execution at law. In these views another learned member of the court expressly concurred; and what is very remarkable, the opinion which had been delivered, is expressly referred to in the preamble to the final decree entered in the case. But this case, I apprehend, notwithstanding the extraordinary preamble of the decree, cannot be considered as deciding any thing beyond the true point involved in the case. That was clearly within the former acknowledged jurisdiction of the court of chancery. It was in no respect necessary, therefore, to *its* decision and the affirmance of the decree of the chancellor, to assert the new and enlarged jurisdiction of that court, which was claimed for it in the leading opinion delivered on the final decision of the case. While, therefore, that decision has been considered as sound law, the reasoning of the leading opinion in it appears not to have been received with equal favor, or to have been acquiesced in either by the courts or the bar. When, therefore, Chancellor Sanford came subsequently, in the case of *Donovan* v. *Finn, Hop. Ch. R.* 59, to review the case of *Hadden and Spader*, while he recognized the decision in that case as law, and, therefore, binding as precedent as to the point involved in the case, he did not concur in that part of the leading opinion in the case which extended the jurisdiction of chancery beyond its former acknowledged limits; but agreed with Justice Platt, in his views of the powers and jurisdiction of the

1841.

Durant
v.
The Supervisors of Albany county.

court in reference to the rights and remedies of creditors. He did not consider the mere entering up of a judgment at law, the issuing of an execution thereon and having it returned unsatisfied, as sufficient of themselves to give the court of chancery jurisdiction in any case, although they might be essential as proving the existence and effect of the fraud that would give that court such jurisdiction; and also as showing that the remedies at law had been exhausted, an indispensable condition precedent to the interference of equity. He very well remarks that, " When a creditor comes to this court for relief, he must come, not merely to obtain judgment, or satisfaction of a judgment, but he must present facts, which form a case of equitable jurisdiction. He must show that the debtor has made some fraudulent disposition of his property, or that the case stands infected with some trust, collusion, or injustice, against which it is the province of this court to give relief. In such cases this court has jurisdiction, *not for the purpose of giving a species of execution, which the courts of law do not afford*, but for the purpose of giving relief in particular cases allotted to its jurisdiction; and when the cause, by reason of such facts, is properly here, the court proceeds upon all the circumstances of the case to give final and effectual relief." In another place he says, " In giving relief in such cases, this court does not proceed upon the idea of giving execution against a species of property, which is exempt from execution at law; but it acts upon some of the most ancient grounds of its jurisdiction, which enable it to give relief in cases of fraud and trust, either to a judgment creditor, or to any other person, whose just rights may be destroyed or impeded by such cause."

Chancellor Sanford lays down the general law upon this subject in these words: " By the existing law, the property of a debtor, consisting of things in action, held by him without fraud, is not subject to the effect of any execution issued against his property; and while a court of law does not reach these things by its execution, a court of chan-

cery does not reach them by its execution, for the purpose of satisfying either judgments at law or decrees in equity. To subject these things to the satisfaction of a judgment, by seizing and selling them, like goods in possession, would be to alter the established law of the land; and this court has no power to make such alteration in the name of equity." And again: "This court has no power to cause stocks, credits and rights of action, held by a debtor without fraud, to be sold or converted into money, or to be transferred to the creditor, or to be applied to the payment of debts. The English courts of equity have never exercised any power like that now proposed, over the rights of the debtor; and it is certain that no such power has ever been exercised by any court in this state." He afterwards remarks that, "The execution against the person was a method of coercion, intended to bring forth, for the satisfaction of the judgment, all such effects of the debtor as could not be subjected to other execution." The legislature, by abolishing imprisonment for debt, has taken away this remedy, without, at that time, having substituted in its place any effectual remedy against the money, stocks, choses in action, and equitable interests of the debtor. It was, undoubtedly, with a view, among other considerations, to furnish such a remedy that the new provisions of the Revised Statutes of 1830 were enacted.

I have been the more liberal in my quotations from the opinion of Chancellor Sanford in the case of *Donovan and Finn*, not only because that case appears to have been fully argued, and well and ably considered, but because they present the views of a Chancellor, who was as faithful and enlightened in the exercise of the powers which he believed himself to possess, as he was careful to abstain from the assumption of those not within his proper jurisdiction; and who, while he was prompt to apply all the legitimate and beneficent prerogatives of equity to the great purposes of justice, viewed with anxiety, and not without painful alarm, the tendency of his own court to an undue

1841.

Durant
v.
The Supervisors of Albany county.

1841.

Durant
*v.*
The Supervisors of Albany county.

accumulation and exercise of powers. Few officers of the court of chancery have lived, whose governing principle appears to contrast more strikingly with that embraced in the old saying, so fully exemplified in the life and character of Cardinal Wolsey, the Chancellor of Henry the VIII. of England: "*That great men in judicial places will never want authority.*"

Views of the case of *Hadden and Spader*, similar to those of Chancellor Sanford, seem to have been entertained by Justice Marcy and others, in the subsequent case of *Pettit* v. *Candler*, in this court in 1829. See 3 *Wendell*, 320. Justice Marcy there says, " The relief asked for and granted in the case of *Hadden* v. *Spader*, lay within the uncontested powers of the court; but the doctrine advanced by some of the judges when that case was reviewed in this court, went greatly beyond the principle necessarily involved in it, and is supposed by Chancellor Sanford not to have the sanction of the court." " Nothing can be certainly said to be established as law by this court in a particular decision, but what is necessarily involved in the case decided." Chief Justice Savage concurred in the views presented by Justice Marcy, with the remark, that " his impressions were that, under the existing law, a defendant is not bound to answer as to property which never was within the reach of an execution." Justice Sutherland concurred, reserving himself upon this latter point.

I think, therefore, that it must be conceded that the law of the decision in the case of *Hadden and Spader* did not extend the jurisdiction of chancery beyond its former acknowledged limits; and that, previous to the statute of 1830, that court, in the absence of fraud, trust, or other head of equity, had no power to compel the discovery of money, stocks, choses in action, or equitable interests of a debtor, not tangible by execution at law; and to apply them, when discovered, to the payment of the debt of a creditor, even although such creditor had obtained a judgment at law, issued an execution thereon, and had it re-

turned unsatisfied. If the court had such jurisdiction already, then the passage of the statute of 1830, expressly giving it that jurisdiction, was unnecessary and is without effect. But I take the passage of that statute to be evidence that, in the opinion of the revisers who proposed it, and the revising legislature who passed it, the court of chancery, independent of the statute, had not the jurisdiction in question. Indeed, the revisers, in presenting the draft of the proposed statute, expressly say, that " deeming it important to settle the law, and preserve the rule as laid down in *Hadden and Spader*, they have prepared the above sections;" thereby clearly implying that without them, the law was not so settled.

But it may be, as it has been repeatedly, said, that this statute is merely declaratory, and only re-asserted jurisdiction which the court of chancery already possessed, but which had been drawn into question and doubt. I am aware that in *Tarbell* v. *Griggs*, 3 *Paige* 207, the present Chancellor said, " *It has been repeatedly decided* that this section of the Revised Statutes is not introductory of a new principle, but is only in affirmance of what was considered by the court of dernier resort, the legitimate jurisdiction of the court of chancery previous to the adoption of the Revised Statutes." The learned Chancellor has not been pleased to refer us to the cases in which it had been *so repeatedly decided*. The statute went into effect in 1830; the Chancellor spoke in 1832, and I am not aware of any decision of any court, during that period, or even down to the present time, giving to the statute in question the character and effect ascribed to it by the Chancellor. If there be any such decision I have been unable to find it. It is true that in *Child* v. *Brace*, 4 *Paige* 309, the Chancellor again says, " It must be recollected, however, that this statute is only declaratory of a principle which had before been adopted in this court." Again, the Chancellor does not refer us to the cases in which the principle of the statute had been adopted in our court of chancery; and I

*In the margin:*
1841.

Durant
*v.*
The Supervisors of Albany county.

1841.

Durant
v.
The Supervi-
sors of Albany
county.

know of no case, in which that principle forms a part of the decree and law of the case. I know that in *Bayard* v. *Hoffman*, 4 *Johns. Ch. R.* 450, Chancellor Kent examined at considerable length the English decisions upon the subject; and in the subsequent case of *McDermott* v. *Strong*, *Id.* 687, he himself states the conclusion to which he came as follows: " In *Bayard and Hoffman* the cases were examined touching the power of this court to enable a creditor to reach *trust property* beyond the reach of an execution at law, and I concluded that the court had and ought to have this power. Now this, even if it had been embraced in the case and incorporated in the decree, and it was neither, would fall far short of the adoption by the court of the broad principle of the statute. That statute authorizes any creditor, in any case, who has obtained a judgment at law, issued an execution thereon, and had it returned unsatisfied, to file a bill in chancery to compel the discovery of any property or thing in action of the defendant, or of any property, money, or things in action due to him or held in trust for him; and it authorizes the court to compel such discovery, prevent any transfer, payment, or delivery of such property to the defendant, and to decree satisfaction of the judgment out of it, whether it were originally liable to be taken in execution or not. Here no fact or incident of equitable cognizance is, as formerly, necessary to give the court jurisdiction. A judgment at law and execution thereon returned unsatisfied, are the only pre-requisites, or condition precedent of such jurisdiction. This presents a principle much broader and more comprehensive than the conclusion to which Chancellor Kent came in *Bayard* v. *Hoffman*. But that conclusion was neither involved in the case, nor embraced in the decree; and cannot, therefore, be said to have been adopted as a general principle by the court. It formed no part of the law of the case. Chancellor Kent himself characterises that case as follows: " This is not a case of a creditor seeking the aid of the court to satisfy his debt out of pro-

perty not to be reached by process; but it is the case of general assignees of the estate" (of an insolvent) " seeking the recovery of all that estate, by virtue of the assignment made for the benefit of all the creditors. In short, here is the case of a voluntary settlement by an insolvent debtor, which is void under the statute; and here are his general assignees seeking the aid of this court to recover property to which they have a title." This, then, was a case embracing well known heads of equity, within the proper jurisdiction of chancery, and decided upon acknowledged equitable principles—principles, however, entirely distinct from that of the statute in question. In no other case before Chancellor Kent of which I am aware, was the principle of the statute involved. The cases of *Brinckerhoff* v. *Brown, Williams* v. *Brown,* and *McDermott* v. *Strong,* were all cases of proper equitable jurisdiction, and were so decided. In neither of them was the principle of the statute either adopted or asserted.

Down to 1827, it would appear that, in the opinion of the present Chancellor himself, notwithstanding the decision in the case of *Hadden and Spader,* neither the doctrine of the leading opinion in that case, nor the principle of the statute of 1830 was the acknowledged law of the court of chancery of this state; for in the case of *Weed and Marvin* v. *Pierce,* which in that year came before him, as Vice-Chancellor of the fourth judicial circuit, he said, "I think with the late Chancellor, that in an ordinary case, free from all fraud and injustice, this court ought not, on the application of an execution creditor, to deprive the debtor of the power of collecting his debts. There must undoubtedly be an unconscientious exercise of that power on the part of the debtor, or some fraud, collusion, injustice, or wilful neglect on his part to collect and apply his debts and choses to satisfy his creditors; or some other ground of equitable jurisdiction in relation to such debts or choses in action, to enable execution creditors, by aid of a court of equity, to reach and apply the same in satisfaction of

1841.

Durant
*v.*
The Supervisors of Albany county.

1841.

Durant
v.
The Supervi-
sors of Albany
county.

their judgments and executions. It must be admitted that the reasoning of Judge Woodworth" (in *Hadden and Spader*,) "would extend the jurisdiction of courts of equity much beyond what the late Chancellor supposed was allowable." Such were the views of Vice-Chancellor Walworth in 1827. They seem to me to be entirely sound, and to present truly the law of the court of chancery down to 1830. But in 1828, when the case of *Pettit* v. *Candler* was first before him, as Chancellor, for an injunction, 1 *Paige* 168, he said: "The cases of *Hadden* v. *Spader* in the court of errors of this state, and *Taylor* v. *Jones*, and *Edgell* v. *Haywood and Dawe* in the English court of chancery, show that after a party has proceeded to judgment and execution at law, he may, by the aid of a court of equity, reach property in the hands of a third person, *which was not in itself liable to execution.*" It is hardly to be supposed that the Chancellor can have referred to this casual remark of his, not involved in the question then before him, nor either necessary or leading to its decision, as the adoption by the court of the principle supposed by him to be merely declared by the statute in question. But as it is an important point in the case now before this court, whether the jurisdiction in question existed previous to, and independent of the Revised Statutes, or was derived from them; and as these cases are much relied on, it may be well to look for a moment at them, and see if they sustain the principle for which they are cited as authority.

The case of *Hadden and Spader*, in this court, we have already seen, was one of trust and fraud, and was, therefore, within the acknowledged jurisdiction of chancery. We have also endeavored to show that, notwithstanding the new doctrine put forth by one learned member of the court, the case decided nothing more than that the decree of Chancellor Kent in the court below, was right and should be affirmed. If we look to that decree in chancery, 5 *Johns. Ch. Rep.* 280, we shall see that the Chancellor put it upon the authority of the cases of *Brinckerhoff* v.

*Brown*, and *McDermott* v. *Strong*, neither of which involved or adopted the principle in question. In the first of these cases, Chancellor Kent says, " The question is not as to a submission to the jurisdiction of the court, but whether the plaintiffs, by their bill, have entitled themselves to the relief sought." The point decided in that case was simply that to entitle a creditor to relief in equity, he must show, besides a proper case of equity jurisdiction, that he had obtained a judgment at law, issued an execution thereon, and had it returned unsatisfied. *McDermott and Strong* was the case of an assignment of a ship in trust to pay specific debts, and to account to the assignor for the surplus. The creditors obtained judgments at law, issued executions, which were levied on the ship, which, under an arrangement of the parties, was sold by the trustees, and the specific debts paid. The execution creditors then filed their bill in equity to obtain the surplus, which the Chancellor very properly decreed to be paid over to them. The case of *Taylor* v. *Jones* was decided in 1743, by Mr. Fortescue, Master of the Rolls. It was a case of trust and fraud; a family settlement, made by one for the benefit of himself, wife and children, and in fraud of creditors. It was, therefore, peculiarly a case of equity jurisdiction. The court, therefore, by reason of the trust and fraud, which were the main characteristics of the case, having legitimate jurisdiction of it, might properly proceed, upon a view of the whole case, to give final and effectual relief. But the authority even of this case has been overruled, and that not merely upon the ground that the complainant was a creditor at large, although holding a warrant of attorney to confess judgment, but having given an unexpired letter of license. It will thus be perceived that this case, although much relied upon by Chancellor Kent in the conclusion to which he came in *Bayard* v. *Hoffman*, would not now be entertained, even in our own court of chancery. The bill would be dismissed, and that upon grounds laid down by that learned Chancellor himself, both in

1841.

Durant
*v.*
The Supervisors of Albany county.

*Brinckerhoff* v. *Brown,* and *McDermott* v. *Strong.* In the latter, the Chancellor says, " I regard the law to be clearly settled, that before a judgment creditor can come here for aid against the goods and chattels of his debtor, or against any equitable interest which he may have therein, he must first take out execution, and cause it to be levied or returned, so as to show thereby, that his remedy at law fails; and that he has also acquired by that act of vigilance, a legal preference to the debtor's interest." The complainant in *Taylor and Jones,* although presenting a case clearly within the jurisdiction of equity, had not thus entitled himself to its interference. At the time of filing his bill he was a creditor at large; he had neither obtained judgment at law, nor issued execution. This case, therefore, does not sustain the principle for which it is cited. The case of *Edgell* v. *Haywood and Dawe,* was decided in 1746, by Lord Chancellor Hardwicke; but, unless I have greatly mistaken the grounds of its decision, instead of sustaining the principle for which it is cited, it is, so far as it is law at all, a direct and strong authority against it. It was the case of a judgment creditor on a bond against an insolvent. The bill was filed against executors of a testator, who had left a legacy to the obligor after his discharge under an insolvent law, to compel them to pay over so much of the legacy, still in their hands, as was necessary to satisfy the judgment. The Lord Chancellor said, " As to the first question, it is a new case; and as far as it is a general question, I am of opinion that the plaintiff, as a judgment creditor, could not come into this court for satisfaction out of this legacy, and so I apprehend it has often been determined; there are very few cases where it is necessary for this court to give relief to creditors over personal chattels in possession, because assignments of them to defeat creditors are void and fraudulent at law; but as to choses in action, according to the general rules of this court, they are not liable to executions." The decree, therefore, was put upon the ground of a special clause in

the insolvent law, giving to the creditors a new remedy against the future effects, including choses in action, of the insolvent, in place of that against his person, which the insolvent law had taken away, by restraining the creditor from seizing or out-lawing his person. But this decree has never been considered as sound law, and has never been followed as a precedent. Lord Chief Baron Richards, in the case of *Otley* v. *Lines*, in the court of exchequer in 1819, 7 *Price, Ex. R.* 274, says, " That the case of *Edgell* v. *Haywood and Dawe*, was a case of very particular circumstances. Lord Hardwicke considered it a case of first impression, and he relieved on the ground, that the plaintiff there was precluded by the statute from proceeding to outlawry. I do not find that that case has ever since been acted on." Baron Graham says, "I own the determination of the case of *Egdell* v. *Haywood and Dawe*, very much surprised me, and I consider it at least a very strong measure. I never recollect an instance of that decision having been followed as an authority in a court of equity in point of practice by the adoption of a proceeding so exceedingly strong." It seems to me, therefore, that neither of these three cases sustains the position for which they were cited; but that the last of them, so far as it is law, is a strong authority against it as a general principle.

Many of the cases in the English courts, particularly during the time of Lord Hardwicke and of his immediate successor, which have been thought by some to contain, or sanction the principle in question, will be found, on examination, to be cases in which an opinion was expressed in favor of the principle, rather than its actual existence asserted as a well established rule of law and settled boundary of jurisdiction.

From the time of Lord Thurlow, however, down to the present time, the decisions of the courts of equity in England have been pretty uniformly against the doctrine advanced in the leading opinion in the case of *Hadden and*

1841.
Durant
v.
The Supervisors of Albany county.

*Spader*. Nor, as it seems to me, had that doctrine previously been adopted in our own courts; but was first asserted in *Hadden and Spader*, and first enacted into law in 1830. I think, therefore, as before expressed, that, down to the time when the Revised Statutes went into effect in 1830, that doctrine was not the law of this state, but that it first became so by virtue of those statutes, which, in that respect, were new enactment. I readily admit that, so far as regards the jurisdiction exercised by the court of chancery, and generally acknowledged, previous to the case of *Hadden and Spader*, as that jurisdiction is laid down in the opinion of Chancellor Sanford in the case of *Donovan and Finn*, the statute of 1830 is declaratory; but so far as that statute extended the jurisdiction of the court beyond the boundaries indicated by Chancellor Sanford in the case of *Donovan and Finn*, and carried it to the extent contended for in the leading opinion in the case of *Hadden and Spader*, the statute was new law, and gave to the court new and enlarged jurisdiction and powers, which, without the statute, it had not, and would not have, possessed. In this I agree with the very satisfactory view taken of this statute, and of the cases of *Hadden and Spader*, and *Donovan and Finn*, by Vice-Chancellor McCoun, in his opinion in the case of *Craig* v. *Hone*, 2 *Edwards' R.* 554. Thus stood the law upon this subject, when the Revised Statutes went into effect in 1830. We come now, therefore, to consider the second question under the first general head.

2. Whether the court of chancery has the jurisdiction in question by virtue of the statute ? The statute is as follows: 2 *R. S. p.* 173, *Part* iii, *Ch.* i, *Tit.* 2, *Art.* 2, § 41, 42, (38, 39.) " § 41, (38.) Whenever an execution against the property of a defendant shall have been issued on a judgment at law, and shall have been returned unsatisfied in whole or in part, the party suing out such execution may file a bill in chancery against such defendant, and any other person, to compel the discovery of any property or things in action belonging to the defendant, and of any

property, money, or thing in action due to him, or held in trust for him; and to prevent the transfer of any such property, money, or thing in action, or the payment or delivery thereof to the defendant, except where such trust has been created by, or the fund so held in trust has proceeded from, some person other than the defendant himself." "§ 42, (39.) The court shall have power to compel such discovery, and to prevent such transfer, payment, or delivery, and to decree satisfaction of the sum remaining due on such judgment, out of any personal property, money, or things in action belonging to the defendant, or held in trust for him, with the exception above stated, which shall be discovered by the proceedings in chancery, whether the same were originally liable to be taken in execution or not." It will thus be perceived that this statute expressly gives to the court of chancery the jurisdiction in question in the case of a creditor having obtained a judgment at law, issued an execution thereon, and had it returned unsatisfied. It now remains to inquire whether the case before the court is so analogous to such a case as to be embraced within the same provisions of the statute, and subject to the same jurisdiction of chancery? There is no evidence to show, nor am I aware that it is pretended, that in the investment of his property the defendant had it in view to evade this tax, or defraud creditors; but that such investment was in all respects legal, made in good faith, and for the convenient and profitable management of his capital. This case, therefore, embraces no general head of equity, but must depend entirely on its supposed analogies to that expressly provided for in the statute. Let us see how far, if at all, these exist. It is a sound general rule of construction, that where a statute either creates a new, or enlarges an existing jurisdiction, the court exercising such new or enlarged jurisdiction, should be held strictly to the jurisdiction authorized by the statute. Now the statute embraces, in *terms*, only the case of an unsatisfied *execution creditor*, and cannot, I think, by any actual

1841.

Durant
*v.*
The Supervisors of Albany county.

or supposed analogy, be made to extend to the case under consideration. But *the equity of the statute* is invoked in favor of the present case. What is often called "*the equity of the statute*," aside from its express provisions, if not an unsafe, is at least an uncertain light. It beams from no fixed orbit—is reflected with steady and unerring brightness from the pages of no book of the law. It exists only in the variable opinions of judges, and the sense which different minds may entertain of the law. In the interpretation of statutes, instead of following the guidance of this ideal and intangible essence, it is much safer to presume that the legislative power meant what it has said, and that it has said all that it meant. That meaning is best derived from the words used, and those words best interpreted by their plain and palpable import. Fortunately for the cause of justice, such is now, more than ever, the tendency of all courts in all countries. But even if by any natural or supposed analogy, any real or imaginary equity of the statute, the case before us could be brought within the provisions of the law, and of course within the jurisdiction of chancery, the parties have not entitled themselves to its interference. Even in the case of the *execution creditor*, expressly provided for in the statute, a compliance with certain requisites is essential as a ground or reason for the interference of equity. So here, the complainants to entitle themselves to the interference of equity, were bound to show either, 1. A complete title; or 2. A compliance with the condition precedent of exhausting their remedies at law; neither of which have they done. In the *first* place, in order to complete their title, "if they seek aid as to real estate, they must show a judgment creating a lien upon such estate; and if they seek aid in respect to personal property, they must show an execution giving them a lien upon the chattels," and thus a legal and equitable preference over creditors at large. This is the law of the case of *Brinckerhoff* v. *Brown*, 4 *Johns. Ch. R.* 671. as well as of other cases, and is required by the Revised

Statutes. In the *second* place, to carry the proceedings at law to the utmost available extent, so as to exhaust the remedies at law, is an indispensable condition precedent to a resort to, or the interference of the court of chancery. This is the law of all the cases, even the earlier ones in the courts of England. It will thus be perceived that the case before the court is destitute of the vital and essential analogies to that expressly provided for in the statute, and indispensable both to bring it within the jurisdiction of chancery, and to entitle it to her equitable interference. This case, as yet, has obtained no lien either upon the real estate or personal property, nor any legal or equitable preference over creditors at large, in order to give it a claim to the interposition of equity.

We have also already seen that the complainants cannot succeed in this case upon general principle. The right to levy and collect taxes in the case before the court, is given by statute, without which it would not exist. The remedy or manner of enforcing that right is also prescribed by statute. Upon the general principle, therefore, supposed already to be established, if the complainants claim the right of the statute, they can only pursue the remedy of the statute. If that remedy be insufficient to give full effect to the right, the legislature, and not the court of chancery, must supply the defect.

But it may be, as it has been said, that this is a hard case, and should, therefore, be liberally considered. It is a truth so familiar that it has grown into an axiom, that, "hard cases make bad precedents and bad law." To depart from well established and generally acknowledged rules of law, in order to do what may seem to be equity in an individual and apparently hard case, would not be more mischievous in its tendency than it would be unsound in principle. The evil in the individual case, however great and palpable, would be trifling in comparison with that of removing the ancient land-marks of the law and permitting a court of already greatly accumulated and overshadowing

powers, to exercise either a usurped or even a doubtful jurisdiction. If the law applicable to this case be wrong, the remedy is not to be sought here. It is the proper prerogative of this court to pronounce the law, not to make it. If that law be either *wrong* or *defective*, it is for the legislative and not the judicial department of the government, to correct the *wrong* and supply the *defect*. The judiciary, even under shelter of the equivocal and often misleading pretext of *the equity of the statute*, ought not either by the usurpation of new, the exercise of doubtful, or the undue extension of acknowledged jurisdiction, to attempt either the one or the other.

If the views above presented on the first general question of jurisdiction, be correct, they are conclusive of the whole case, and render unnecessary an examination of the second general question, viz: whether, admitting the jurisdiction, the supervisors were the proper complainants in this case? Waiving, therefore, a consideration of this second question, I shall, upon the grounds above presented on the first, vote for a reversal of the decree of the court of chancery in this case.

On the question being put, *Shall this decree be reversed?* the members of the court divided as follows:

*In the affirmative:* The PRESIDENT of the Senate, and *Senators* DICKINSON, FURMAN, HAWKINS, LEE, H. A. LIVINGSTON, NICHOLAS, PLATT, ROOT and SCOTT—10.

*In the negative:* Mr. Justice COWEN, and *Senators* CLARK, ELY, HOPKINS, HUMPHREY, JOHNSON, RHOADES, and VERPLANCK—8.

Whereupon the decree of the Chancellor was REVERSED.