# GEORGE F. HARDING, EXR. etc.

*v.*

# THE COMMERCIAL LOAN COMPANY *et al.*

1. CONTRACT—*presumption that writings express all its terms.* Where, after negotiations respecting a contract, the result is placed in one or more written instruments, they are presumed to contain all that was agreed to, and the precise terms and conditions of the agreement.

2. SAME — *option to pay less sum in shorter time.* Where a party, having a debt payable to him in three years, gives the debtor a written agreement to accept a less sum in satisfaction, if paid within sixty days, this will be a mere option or privilege to the debtor, which, to be availed of, must be promptly complied with.

3. SAME — *agreement to accept a less sum available only as between original parties.* Where the purchaser of land had the option of discharging a debt of $20,000, due in three years, by the payment of $18,000 in sixty days, and sold the land subject to the debt due thereon, of $20,000, which his grantee agreed to assume and pay, it was *held*, that the latter could not claim the right to discharge the debt by the payment of the $18,000.

4. SAME—*must be on a consideration.* Where a party, having the privilege of discharging a lien on his land by payment of a less sum than due, if paid within a given time, conveyed the land to another, who assumed the payment of the entire debt, and the first party afterwards, without any consideration, transferred his rights under the contract to his grantee, it was *held*, that the latter could not enforce the privilege of his grantor, and discharge the lien by paying the smaller sum.

5. COLLATERAL SECURITY—*whether note and deed of trust is.* Where a note and deed of trust are given, on the purchase of land, for the balance due, the fact that the vendor gives the purchaser a written agreement to accept a less sum if paid in sixty days instead of three years, as expressed in the note, and to assign the note and trust deed to enable the purchaser to borrow the money, will not show that the note and trust deed were intended merely as collateral security.

6. And where the party purchasing and giving the deed of trust afterwards sells the land to another, subject to the deed of trust, which the latter assumes and agrees to discharge, this will afford evidence that the note and deed of trust were given to secure a *bona fide* indebtedness, and not merely as collateral security.

7. TENDER—*by check, when not good.* . Where the makers of a note and deed of trust for $20,000 were to have the same assigned by the payee, according to directions, upon payment of $18,000 in a less time, the tender of a check, not certified, and which would not be honored unless the note and

deed of trust were first surrendered to the drawee, is wholly insufficient to avail of the option given to pay the smaller sum.

8. FRAUD—*who may avail of, in sale of land.* If the vendor of land is guilty of fraud in the sale, by misrepresenting his title, a subsequent purchaser from the original vendee, who assumes the payment of the original purchase money still due, can not avail of it in a proceeding to foreclose, where it is not·shown that such subsequent grantee was in any way influenced by such representations.

9. SAME—*subsequent agreement does not relate back.* Where land is bought upon the information contained in an abstract of title, and the grantor afterwards, when defects are pointed out in the title by one about to purchase, agrees with his grantee to perfect the title, this subsequent agreement will not relate back and characterize the original sale so as to make it fraudulent.

10. INJUNCTION—*as to foreclosure—for defect in title to land sold.* Where a party, selling and conveying land by warranty deed, had a voidable title as to an undivided one-fifth part, holding under a conveyance from a minor, who had brought no suit to avoid his deed, and who had threatened none, and the purchaser and his grantee had, ever since the original sale, remained in the undisputed possession of the property, it was *held*, that the subsequent grantee could not enjoin proceedings to foreclose the deed of trust given by the first purchaser for the unpaid purchase money. If the minor had sued to avoid his conveyance, or had seriously threatened to do so, a foreclosure would be enjoined until such suit was ended.

11. VENDOR AND VENDEE—*resisting payment of price for defects in title.* Where there is no fraud in the sale of land, and a warranty deed is given, the purchaser, being in the actual possession of the land, can not, in equity, enjoin or resist the payment of the purchase money on the ground of a defect as to part of the title, before eviction or measures taken to assert the hostile claim.

APPEAL from the Circuit Court of Cook county; the Hon. WILLIAM W. FARWELL, Judge, presiding.

Messrs. HARDING, McCoy & PRATT, for the appellant.

Mr. S. CORNING JUDD, and Mr. GEORGE W. SMITH, for the appellees.

Mr. JUSTICE SCHOLFIELD delivered the opinion of the Court:

Abner C. Harding, the testator of the appellant, exhibited his bill in the court below against the Commercial Loan Company, Charles T. Brown and others, praying that the sale of

certain property therein described, under a trust deed executed by May & Coffman to Charles T. Brown, to secure the payment of a promissory note for $20.000, and which had been assigned by Brown to the Commercial Loan Company, be enjoined. Answers were filed by the several defendants to the bill, and the Commercial Loan Company also filed its cross-bill, alleging the destruction of the court house by fire, since the execution of the trust deed; and the consequent difficulty in effecting a sale by the trustee in literal conformity with the terms of his power, which required the sale to be at the north door of the court house, and praying a foreclosure and sale under the direction of the court.

On final hearing, the court refused to grant the injunction prayed for by the original bill, but decreed in conformity with the prayer of the cross-bill of the Commercial Loan Company.

Abner C. Harding having died testate pending the proceedings, his executor, George F. Harding, was substituted as party in his stead, and he appeals to this court.

The trust deed, foreclosure of which was decreed, was executed by May & Coffman to Charles T. Brown, on the 27th of June, 1871, to secure the payment of their promissory note to him, of that date, payable three years after date, together with eight per cent per annum interest thereon, payable annually; and it was also therein provided, that upon the non-payment of any installment of interest when due, the entire amount of the note might be declared due, and the trustee proceed to sell the property conveyed by the deed, for the payment of the $20,000 and interest accrued thereon.

Brown had conveyed, by warranty deed, the property described in the deed of trust, to May & Coffman, on the same day the deed of trust was executed, and the indebtedness of May & Coffman to him was solely in consideration of the sale of the property by him to them. On the 21st of July, 1871, May & Coffman conveyed the property, by warranty deed, to George Bickerdike, expressly subject, however, to the deed of trust to Brown, payment of the amount secured by which was

assumed by Bickerdike. On the 7th day of December, 1871, Bickerdike sold and conveyed the property, by warranty deed, to Abner C. Harding—subject, also, to the deed of trust to Brown, payment of the amount secured by which, being therein also expressly assumed by Harding.

Harding paid the first year's interest due on the $20,000 note, after his purchase. On the 14th of August, 1872, Brown sold and assigned the $20,000 note, and deed of trust securing the same, to the Commercial Loan Company, the transaction on the part of the company being conducted by Buchanan, vice-president of the company.

The interest falling due on the note in June, 1873, not having been paid, after notice to May & Coffman and Harding, requesting its payment, the Commercial Loan Company proceeded to declare the principal of the note due, and directed the trustee to advertise and sell pursuant to the terms of the power in the deed, which he was proceeding to do when the original bill was filed.

Sometime in 1873, and shortly before the filing of the bill, May & Coffman assigned what interest they had or pretended to have, in the note and deed of trust, to Harding.

It is conceded that $9000 were paid by May & Coffman to Brown, on the property, before he conveyed to them, but there is dispute as to the full price agreed on between them. They insist that it was $27,000, leaving only $18,000 due, after the payment of the $9000, while Brown claims that it was $29,000, leaving $20,000 due after the payment of the $9000.

Appellant insists that the note for $20,000 and trust deed were not intended as evidence of and security for the payment of original indebtedness, but as collateral security only; that there were defects in Brown's title which he agreed to have perfected by certain quitclaim deeds, which he agreed to obtain without delay, and that the note and trust deed were deposited with the trustee upon the agreement, that if Brown obtained the quitclaim deeds perfecting his title, and May & Coffman paid the $18,000 in sixty days, the note and deed of trust were to be assigned, under May & Coffman's direction,

that they might use them in securing the $18.000, which it was known they would have to borrow on the faith of that security. Appellant also insists that Brown did not secure the desired quitclaim deeds; that it was impossible for him to do so, and that May & Coffman did tender his agent, the custodian of the note, the $18,000 within the sixty days.

Brown claims, that in a preliminary agreement between him and May & Coffman, relative to the sale of the property, made early in June, 1871, he agreed to take $27,000 cash, or within a short time, which was specified, for the property, and if they did not pay the amount, they were to forfeit $500; that they gave him a check for $500, which was dishonored and worthless, and that such sale was no further attempted to be consummated; that they finally agreed on a sale of the property for $9000 in cash, and $20,000 in three years, at eight per cent per annum interest, payable annually, to be secured by deed of trust on the property—he, however, to give them the option to make it a cash sale at $27,000, by their paying $18,000 in sixty days.

Both parties agree that Brown executed to May & Coffman an instrument in writing, agreeing to take for his debt $18,-000 in sixty days, but it was destroyed by the great fire in Chicago, of October 9, 1871, and there is some disagreement between witnesses as to its contents.

Brown denies that he was to furnish additional deeds as a condition precedent to a consummation of the terms of the sale, and he also denies that he was tendered the $18,000 within sixty days, or at any other time.

The evidence on these points is conflicting, and, as we think, too voluminous to justify its reproduction here. We shall, therefore, do but little more, in this respect, than state the conclusion to which we have arrived, after its careful perusal.

We are of opinion that Brown's version of the contract is most consistent with the undisputed facts in the case, and, therefore, entitled to the most reliance.

In the first place, if the note and trust deed had been intended as collateral security merely, it is most singular that

men engaged in the business of real estate brokers, as May & Coffman were, and presumed to have been informed thoroughly of all that related to the prosecution of their business, should not have required the deed of trust to state truly the purpose of its execution. Where, after negotiations, the result is placed in one or more written instruments, they are presumed to contain all that was agreed to, and the precise terms and conditions of the agreement. It is not pretended the deed of trust contains anything to show that the note secured by it was not a *bona fide* evidence of original indebtedness, and that it might be defeated otherwise than by the payment of the note. Nor does the instrument executed by Brown to May & Coffman, authorizing the trustee to receive $18,000 within sixty days, even if it be conceded, as they claim, that it authorized the trustee to assign the note to them, instead of canceling it, upon payment of the $18,000, prove that it was intended to be collateral only. It is not pretended it contained recitals to that effect, and it shows, merely, a willingness by Brown, that after his debt was paid, May & Coffman might be at liberty to make such use of it as they should choose.

In the second place, the deed from Brown to May & Coffman recites that the consideration for the conveyance was $29,000; and it very much impairs the attempt to explain away the effect of this admission, that May & Coffman are driven to say this amount was inserted, at their instance, that they might deceive and impose upon Bickerdike.

And, finally, May & Coffman, in conveying to Bickerdike, expressly recognize the $20,000 note and the deed of trust as a *bona fide* indebtedness to Brown, and lien upon the property —payment of which, by their contract with Bickerdike, he assumes. And so Bickerdike, in his conveyance to Harding, expressly recognizes the existence of the same indebtedness and lien, and Harding, by his contract with Bickerdike, also assumes its payment.

We regard the agreement of Brown to accept $18,000 in sixty days in satisfaction of his demand, as a mere option or

privilege, which, to have been availed of, should have been promptly complied with. The evidence of a pretended tender is entirely insufficient. May & Coffman were required, even by their own version of the agreement, to pay the $18,000, before they were to have the note and deed assigned under their direction. They had no money. The check they presented was not certified, and would not be honored unless the note and deed of trust were first surrendered and assigned to the drawee. They do not claim the agreement was, that the note and deed of trust were to be assigned and surrendered to them, on their request, to enable them to negotiate them for the $18,000, yet this is the effect, and only effect, of what they offered to do in their attempted compliance with that agreement. It was for them to have the money *before they got possession of the note and deed of trust,* and not to have it *on condition they first obtained the note and deed of trust, and had them properly assigned to the drawee of the check.*

Besides this, we can but regard the admitted facts that May & Coffman, in conveying the property to Bickerdike, required him to assume the payment of the $20,000 as a subsisting lien on the property, and, that until the filing of their answer in this suit, they neither attempted to assert any rights which they claim to have been deprived of by Brown under that contract, nor gave notice to Bickerdike or Harding, either prior or subsequent to their respective purchases, requiring the payment to them of any part of the $20,000, as satisfactory evidence of an abandonment of any claim they might have had on that account. But suppose we were to assume that the contract was as claimed by May & Coffman, and that they did all they were required to do to avail of its provisions, how stands the case? They were entitled to redeem by paying $18,000, with accruing interest. Did they transfer this right to Bickerdike, and he transfer it to Harding? Surely not, for by their contract with Bickerdike, and by his contract with Harding, the premises are subject to a lien of $20,000, which the grantee assumes to pay. The presumption is, that Bickerdike paid May & Coffman less by the amount of the difference between

17—84TH ILL.

$18,000 and $20,000, than he would have paid if the incumbrance had been only $18,000, and the same applies to Harding's purchase from Bickerdike. So it results, if any body is still entitled to the benefit of the option, it is May & Coffman. Harding, as purchaser, should pay the $20,000, because he agreed to do so. It was part of the consideration for which the title was conveyed to him.

But May & Coffman were parties to this suit. They filed no cross-bill against Brown and the Commercial Loan Company, and the court, by its decree, in effect adjudged they had no rights to be protected, growing out of their contract with Brown; and they do not appeal from that decree. Suppose, as against Brown, or the Commercial Loan Company, they are entitled to $2000 and accruing interest, which they are cut off from by this decree, it does not help Harding, unless he can show that he is, in some way, equitably entitled to it. He attempts to do this by showing that shortly before he filed his bill, May & Coffman assigned their interest in the trust note to him. As against this, however, there is the insuperable objection that the evidence shows no consideration was in fact paid for the assignment, and it was made solely in consideration of a champertous agreement. *Thompson* v. *Reynolds*, 73 Ill. 11.

Appellant makes the point, that Brown was guilty of actual fraud in his sale to May & Coffman, in misrepresenting the character of his title to the land. Since May & Coffman are not here complaining of that fraud, and Harding is a purchaser of the title from a grantee of their grantee, claiming under a deed with full covenants of warranty, and is in nowise shown to have been influenced in his purchase by what Brown said to May & Coffman in regard to the title, it is not seen how such fraud can affect him. But we think the reasonable inference from the evidence is, that May & Coffman, as also Bickerdike and Harding, as well as the Commercial Loan Company, were governed in their respective purchases, not by verbal representations as to the title, but by the abstract. Indeed, in the endeavor to show that May & Coffman were

entitled to redeem upon the payment of $18,000, much stress is placed on the fact claimed that the abstract furnished was not satisfactory. and that Brown then agreed to get quitclaims, which he did not and could not do. This was after the negotiation with Bickerdike. and after his attorney had returned the abstract with the defects pointed out. The abstract contained information which, followed up, led to a knowledge of the objection now urged against the title; and it is clear that, up to this time, the parties were relying upon the abstract. Any promise then made by Brown in respect to what he would do in the future to perfect the title, could not have misled as to the defect then in view, or relate back to, and characterize the original sale to May & Coffman so as to make it fraudulent.

The point is made, that there is a failure of title to one-fifth of the property, and appellant insists that there is, to that extent, a failure of the consideration for which the $20,000 note was given.

The facts upon which this is predicated are these: The property came by inheritance, from their father, to Charles T. Brown, his three brothers, and one sister, so that each was seized in fee of an undivided one-fifth. . Proceedings were had in which Charles T. Brown, his sister, and all of his brothers but one, were petitioners, and the other brother and certain tenants were made defendants, for partition. The brother made defendant was not served with process, but before the cause was reached for hearing, he conveyed his interest to Charles T. Brown; and when the cause came on to be heard, this fact being shown by supplemental petition, the proceeding was dismissed as to him. Decree for partition was granted, commissioners were appointed who reported the property insusceptible of division, and a sale, by a commissioner appointed for that purpose, decreed. At the sale pursuant to the decree, Charles T. Brown became the purchaser, and received a deed. All of the parties have, since then, quitclaimed to Charles T. Brown; but Albert J. Brown, at the time of exe-

cuting his quitclaim, was a minor, and so continued up to the filing of the bill.

We do not deem it worth while to inquire whether Charles T. Brown obtained a title, in all respects valid, by his purchase at the commissioners' sale. It is certain the quitclaims vested him with a valid title as to the entire property, except the one-fifth interest of Albert J., and, as to this interest, the quit-claim vested him with a voidable title. Albert J. might avoid the title conveyed by that instrument, within a reasonable time after becoming of age, and upon equitable terms, but no one else could do so. As to this one-fifth interest, therefore, May & Coffman, and Bickerdike and Harding, got a voidable title. It may, by acquiescence or express ratification by Albert J., become a good title, or it may be avoided; but there is no pretense that any steps have yet been taken by Albert J. to avoid the title as to his interest. He has brought no suit for that purpose, is threatening to bring none, and there is no assurance that he ever will do so. Harding was in the undisturbed possession of the whole property, after his purchase, until his death, and his executor, the appellant, has been in the like possession since.

Neither Harding, in his lifetime, nor his executor or devisee since his death, offered to rescind the contract, in whole or in part, in consequence of the supposed failure of title in respect to Albert J. Brown's interest, but, on the contrary, held and enjoyed the possession of the property, seemingly satisfied with the guaranty offered by the covenants of warranty. Were a suit, at the instance of Albert J., pending, or, possibly, seriously threatened, we do not question that complainant would have been entitled to have proceedings on the mortgage enjoined until that suit was ended and the question of his title determined; but there being no suit pending or threatened, and the proof failing to establish fraud in the sale, in respect to any title Albert J. may claim, the law is clearly settled there is no ground for injunction. The question was before the Chancery Court of New York, at an early day, and received the careful consideration of Chancellor KENT, in

*Abbott* v. *Allen, Exr.* 2 Johns. Chy. Rep. 519. The object sought by the bill there, as here, was to enjoin the collection of a mortgage given to secure the payment of the purchase money for land. on the ground that the title was imperfect. It was held the bill would not lie, the Chancellor, among other things, saying: "This case comes within the general doctrine declared in *Bumpus* v. *Patner*, (1 Johns. Chy. Rep. 213–218,) that a purchaser of land, who is in possession, can not have relief here against his contract to pay, on the mere ground of defect of title, without a previous eviction; but, without resting on the opinion there delivered, I have again examined the question, inasmuch as the doctrine in that case was doubted by the learned counsel who opposed the motion.

" If there be no fraud in the case, the purchaser must resort to his covenants, if he apprehends a failure or defect of title, and wishes relief before eviction. This is not the appropriate tribunal for the trial of titles to land. It would lead to the greatest inconvenience, and, perhaps, abuse, if a purchaser in the actual enjoyment of land, and when no third person asserts, or takes any measures to assert, a hostile claim, can be permitted, on suggestion of a defect or failure of title, and on the principle of *quia timet*, to stop the payment of the purchase money, and of all proceedings at law to recover it. Can this court proceed to try the validity of the outstanding claim in the absence of the party in whom it is supposed to reside, or must he be brought into court, against his will, to assert or renounce a title which he never asserted, and, perhaps, never thought of ? I apprehend there is no such practice or doctrine in this court."

*Van Wagoner* v. *McEwen*, 1 Green's Chy. (N. J.) 412, is the same kind of a case, and the ruling was the same. See, also, *Edwards* v. *Bodine.* 26 Wendell, 108, *Shannon* v. *Morselis et al.* Saxton, 426, *Natchez* v. *Minor*, 9 Smedes & Marshall, 544, *Davisson* v. *DeFreest*, 3 Sandford's Chy. 456, to the same effect.

The proof is entirely satisfactory that the Commercial Loan Company is a *bona fide* assignee and owner of the note and

deed of trust; and its declaring the whole amount, principal as well as interest, due, in consequence of the non-payment of interest, was strictly within the terms of the power contained in the deed.

On the whole, we do not perceive that the decree of foreclosure does appellant any injustice, from which, under his present bill, relief could have been decreed.

We do not regard the objection taken, that there is, as to the cross-bill, a variance between the allegations and proofs, as tenable. We think the allegations of the cross-bill are substantially proved, and this is sufficient.

The decree will be affirmed.

*Decree affirmed.*

Mr. JUSTICE DICKEY, dissenting:

I can not concur in this decision or in the views expressed in the opinion. In my view of the case, an assignee of a mortgage or trust deed has no higher equity than his assignor, the mortgagee, or beneficiary named in the trust deed, had. When such assignee comes into a court of equity to foreclose, he merely asserts for his benefit the equities which his assignor had. In such case, where the mortgage or trust deed was given to secure part of the purchase money for land which his assignor conveyed, with full covenants of title, to the mortgagor, or maker of the trust deed, and it appears, at the hearing, that the vendor to an undivided fifth part of the land sold and conveyed had merely a voidable title—and a title which, at the time when he or his assignee seeks the aid of the court in foreclosing, remains imperfect and liable to be destroyed—equity demands of such complainant that he should forbear in the collection of a suitable portion of the purchaser until the title to this undivided one-fifth shall be made good. He that seeks equity must do equity; and this position holds good in favor of any subsequent grantee of complainant's assignor, who bought the land on the faith of such covenants. This is the true doctrine in a court of equity, whether the covenants are such as technically run with the land or not. It is suffi-

cient that such grantee is a privy to the estate and is injured by the breach of the covenants. It follows that, on the cross-bill in this case, the foreclosure should not have been for the whole of the unpaid purchase money, but an amount sufficient for indemnity should have been postponed until the perfection of the title to the whole, and the foreclosure should have been for the balance only.